IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT A. LOCASTRO, D.O., _et ux._     :
                                        :
        v.                              :     Civil No. WMN-02-781
                                        :
THE PAUL REVERE LIFE INSURANCE          :
        COMPANY, _et al._               :

**MEMORANDUM**

Before the Court are several Motions to Dismiss, or in the
Alternative for Summary Judgment, filed by Defendant Paul Revere Life
Insurance Company (Paper No. 40), Defendants John L. Bianchi,
Margaret M. O'Hara, Shelley A. McKiernan, and Judy LaRochelle (Paper
No. 42), and Defendants Paul Revere Insurance Group, Provident Life
and Accident Insurance Company, Provident Insurance Companies, Inc.,
and UNUMProvident Corporation (Paper No. 43), as well as a Motion to
Strike Immaterial, Impertinent, and Scandalous Matter from
Plaintiff's Amended Complaint filed by Defendant Paul Revere Life
Insurance Company (Paper No. 41).[1]  Upon a review of the pleadings
and the applicable case law, the Court determines that no hearing is
necessary (Local Rule 105.6) and that the motion of the individual
defendants will be granted, the motions of the corporate defendants
will be granted in part and denied in part, and the motion to strike
will be denied.

**I.  BACKGROUND**

---

[1] Also on the court docket are four similar motions attacking
the original complaint.  Paper Nos. 8, 10, 12, and 13.  These motions
all will be denied as moot.

This action arises out of dispute concerning a policy for long term disability insurance.  Plaintiff, Dr. Robert Locastro, purchased an "own occupation" disability policy from Defendant Paul Revere Life Insurance Company (Paul Revere) in August 1994.  Plaintiffs allege that, as a result of a series of back injuries, Dr. Locastro was rendered unable to continue to perform his duties as an anesthesiologist and that, as of February 12, 1999, he was placed on medical leave.  In March 1999, Dr. Locastro's treating physician submitted a disability benefit claim form to Paul Revere on Dr. Locastro's behalf.  The claim was handled first by Defendant Margaret O'Hara, then by Defendant Shelley McKiernam, and then by Defendant Judy LaRochelle, all employees of Defendant Paul Revere.

On December 2, 1999, Paul Revere denied Dr. Locastro's claim.  According to the Complaint, Paul Revere based its denial on the report of Defendant Dr. John Bianchi, Paul Revere's in-house orthopaedic surgeon.  Plaintiffs complain that Dr. Bianchi never saw or spoke with Dr. Locastro in the process of forming his opinion, never reviewed the medical records forwarded to Paul Revere, and refused to arrange for an independent medical examination (IME).  They also note that Dr. Bianchi's opinion is at odds with the medical conclusions of at least five other physicians, all of whom concluded that Dr. Locastro was totally and permanently disabled and incapable of returning to work as an anesthesiologist.  In sum, Plaintiffs contend that Dr. Bianchi failed to make a "good faith investigation into Dr. Locastro's medical condition before he rendered his written

report pronouncing Dr. Locastro fit and able to carry on as an anesthesiologist." Amended Complaint at ¶ 37.

Plaintiffs also contend that the denial of Dr. Locastro's claim was not an independent or isolated event. They allege that Paul Revere has engaged in a widespread pattern and practice of denying disability claims without justification. Specifically, they allege that "some time in or around 1997, Paul Revere and/or Paul Revere Group deliberately, surreptitiously, and intentionally changed its corporate policy regarding payment of disability claims. . . . [T]hat Paul Revere and/or Paul Revere Group and thereafter, Provident, Provident Holding and/or UNUMProvident[2] adopted a specific corporate strategy of denying disability claims or terminating disability claims, not based on the insurers' policies, not based on the medical needs of the insured, and not based upon any legal reason, but solely for the purpose of terminating medical expenses in a demonstration of malice and ill will toward its insureds such as Dr. Locastro." Id. at ¶ 42.

Based upon these allegations, Dr. Locastro and his wife, Joan, filed a complaint in the Circuit Court for Baltimore City naming as Defendants: the various insurance companies; Dr. Bianchi; the three

---

[2] According to the allegations in the Amended Complaint, Defendants Paul Revere and Paul Revere Insurance Group (Paul Revere Group) were "absorbed" into Defendants Provident Life and Accident Insurance Company (Provident) and/or Provident Insurance Companies, Inc. (Provident Holding) in February 1997. Also according to the Amended Complaint, Provident and Provident Holdings merged with UNUM Corporation to form UNUMProvident Corporation in July 1999.

individual employees involved in the handling of Dr. Locastro's claim; and the insurance agents that sold Dr. Locastro the disability policy. Defendants removed the action to this Court on the basis of diversity jurisdiction. In so moving, Defendants argued that the insurance agents who sold the policy, whose Maryland citizenship would otherwise destroy complete diversity, were fraudulently joined. In a memorandum dated July 22, 2002, this Court held that the Complaint, as filed in the state court, failed to state a claim against the agents. Accordingly, the Court dismissed those Defendants and denied the motion to remand.

On August 10, 2002, Plaintiffs filed an Amended Complaint, eliminating some of the causes of action found in the original complaint, adding a new cause of action under the Racketeer Influences and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO), and bolstering the allegations in support of their fraud claims. See Amended Complaint at ¶¶ 49-54. The complaint, as amended, now includes causes of action for: Breach of Contract (Count One); Breach of Covenant of Good Faith and Fair Dealing (Count Three); Fraud (Count Six); Intentional Infliction of Emotional Distress (Count Eight); Intentional Interference with Contract (Count Ten, against Dr. Bianchi); and for RICO violations (Count Thirteen). In addition, Plaintiffs: assert various conspiracy claims based upon the substantive causes of action (Counts Two, Four, Seven, Nine and Eleven); include a count for a declaratory judgment (Count Five); bring a loss of

4

consortium claim (Count Twelve); and include counts under which they seek to impose liability on UNUMProvident for the acts of its predecessors (Count Fourteen), and its subsidiaries (Count Fifteen).  Defendants' motions challenge all but the breach of contract and declaratory judgment claims.

## II. LEGAL STANDARDS

Defendants have moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, for summary judgment pursuant to Rule 56.  A court considers only the pleadings when deciding a Rule 12(b)(6) motion.  If matters outside the pleadings are presented and not excluded, the motion must be considered under the summary judgment standard of Rule 56.  See, Villeda v. Prince George's County, MD., 219 F.Supp.2d 696, 698 (D. Md. 2002).  For a majority of the issues raised in these pleadings, the parties have not submitted matters outside of the pleadings.  For these, the motions will be treated as motions to dismiss.  For the few issues in which outside material was submitted and considered, the Court will apply the summary judgment standard.

A motion to dismiss pursuant to Rule 12(b)(6) requires a court to accept all well-pled allegations of the complaint as true and to construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.  See Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).  A motion to dismiss should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law." See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986).  If "the evidence [is] so one-sided that one party must prevail as a matter of law," the court must grant summary judgment in that party's favor.  Id. at 268.  "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party."  Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  In ruling on a motion for summary judgment, the court assumes that all of the non-moving party's evidence is worthy of belief, and all justifiable inferences are to be drawn in favor of the non-moving party. Anderson, 477 U.S. at 252; Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Only when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party" can the court grant a motion for summary judgment.  Matsushita, 475 U.S. at 587.

**III. DISCUSSION**

 **A. Exhaustion of Remedies/Estoppel**

  Before Plaintiffs filed suit in the Circuit Court for Baltimore City, Dr. Locastro instituted administrative proceedings against Paul Revere before the Maryland Insurance Administration (MIA).  Defendants argue that Plaintiffs' failure to completely exhaust their remedies in those proceedings bars them from going forward in this Court.  Defendants also argue that findings made in the administrative proceedings collaterally estop Plaintiffs from bringing their tort claims here.

  Dr. Locastro filed his complaint with the MIA in August 1999.  After investigating the complaint, the MIA concluded that Paul Revere had acted

6

arbitrarily or capriciously in disallowing Dr. Locastro's disability claim. Based upon that finding, the MIA issued a notice charging Paul Revere with a violation of Md. Code Ann., Ins. II § 27-303(2)[3] in May 2000 and in that notice, requested that Paul Revere reverse its disability determination.   Paul Revere requested a hearing on that notice.   Following several days of hearings in which Dr. Locastro participated as a witness but not as a party, the Administrative Law Judge issued a "Recommended Decision" concluding that Paul Revere did not act arbitrarily or capriciously in disallowing the claim, and thus, did not violate § 27-303(2) of the Insurance Code.   On April 9, 2001, the MIA issued a "Final Order," adopting the ALJ's Recommended Decision.

On September 23, 2001, Dr. Locastro sent a letter to the MIA, documenting his further unsuccessful attempts to persuade Paul Revere to reconsider its denial of his benefits.   This generated a series of correspondence between Paul Revere and MIA.[4]   Defendants characterize the September 23, 2001 letter as the initiation of a second administrative

---

[3]Sections 27-301, et seq., of the Insurance Article, is intended to provide additional administrative remedies to victims of unfair claims settlement practices on the part of their insurers.   Section 27-303(2) states that "refus[ing] to pay a claim for an arbitrary or capricious reason based on all available information" is an unfair claim settlement practice.

[4] Dr. Locastro's letter also prompted a letter from Paul Revere to Dr. Locastro informing him that it had "tentatively" reopened his claim.   Defs.' Exh. 7, letter dated January 2, 2002.   Paul Revere also forwarded a check for benefits for the period March 19, 2001 to December 17, 2001, but stated that the payment was made under a "reservation of rights" and cautioned that its issuance "should not be construed as acceptance of liability for the above noted period." Concerned about the implications of the reservation of rights language, Dr. Locastro returned the check.

proceeding, and argue that Plaintiffs have failed to fully exhaust that proceeding.

This argument is unavailing. First, it does not appear to be factually supported. Reviewing the correspondence, it does not appear that the MIA treated Dr. Locastro's letter as a new administrative complaint. Furthermore it appears that the MIA was of the opinion that there were no further administrative steps that it could take on Dr. Locastro's behalf. On January 29, 2002, Lynda Miller, Insurance Investigator for the MIA, sent Dr. Locastro a letter indicating that the MIA "cannot compel any further action in this matter," and that "[t]his is a final determination within this administrative level, and our files will be closed accordingly." Amended Complaint at ¶ 2.

The Court disagrees with Defendants' conclusions as to the scope of any exhaustion requirement. The Maryland Court of Special Appeals decision relied upon by Defendants, <u>Magan v. Medical Mut. Liab. Ins. Soc'y of Md.</u>, 81 Md. App 301 (1989), cited the general rule that "where a statute provides a special form of remedy, the complainant must use that form and must not bypass the administrative body by pursuing other remedies." <u>Id.</u> at 306. The statute that was the subject of the administrative proceedings, Md. Code. Ann., Ins. II § 27-303, is limited to unfair claim settlement practices. As explained below, Plaintiffs' claims in this action are much broader.[5]

Defendants' issue preclusion argument is also unavailing. Dr. Locastro

---

[5] Section 27-301 expressly provides that "[t]his subtitle does not impair the right of a person to seek redress in law or equity for conduct that otherwise is actionable." Md. Code. Ann., Insurance II § 27-301(3).

was not a party in the administrative proceeding and, according to the Amended

Complaint, he was told "in no uncertain terms time and again" that he could

not be.  Amended Complaint at ¶ 3.  "Under Maryland law, collateral estoppel,

or issue preclusion, applies only if it is established that . . . the party

against whom the decision is being used was a party in the prior action."

O'Reilly v. County Bd. of Appeals for Montgomery County, Md., 900 F.2d 789,

791 (4th Cir. 1990).  Paul Revere provides no authority to the contrary.[6]

**B. Who are the Proper Defendants?**

Before addressing the sufficiency of the allegations supporting

the various theories of liability, the Court must ascertain the

proper defendants.  As mentioned above, the Amended Complaint details

a corporate history that has Paul Revere and/or Paul Revere Group

"absorbed" into Provident and/or Provident Holding; and Provident and

Provident Holding merging with UNUM Corporation to form UNUMProvident

Corporation.  On the basis of this history, Plaintiffs have named

each of these corporate entities as Defendants.  Defendants have

moved to dismiss all of these entities except Paul Revere, the

---

[6] In reviewing the decision of the ALJ, it would appear that
choices that the MIA made in how it presented its case may have
significantly impacted the result.  The ALJ specifically noted that
"[n]o expert witnesses were called by the MIA to help the ALJ
understand its argument that [Paul Revere's] in-house medical
consultant did not rationally and reasonably consider the medical
information purporting to show the Insured was totally disabled."
Recommended Decision at 28.  This is obviously a crucial issue on
which the MIA failed to produce an expert witness when, in the ALJ's
view, an expert witness was clearly needed.  If, as Plaintiffs
assert, Dr. Locastro was prevented from participating in the
presentation of the claim, it would be inequitable to encumber
Plaintiffs with the result.

company that initially entered into the insurance contract with Dr.
Locastro.  Defendants assert that "Paul Revere Insurance Group" is
simply a trade name and not an entity capable of being sued, and that
they are not aware of any entity known as "Provident Insurance
Companies."  Furthermore, Defendant deny that Paul Revere ever merged
into Provident.  Plaintiffs, in response, concede only that
"Provident Insurance Companies, Inc." was a misnomer, and that the
corporation should have been identified as "Provident Companies,
Inc."

At this stage in the litigation, the Court will not dismiss any
of the corporate entities, and will grant Plaintiffs leave to amend
the complaint to correct the misnomer of Provident Companies, Inc.
While Defendants have submitted an affidavit in which the affiant
states that Paul Revere Group is merely a trade name, and that Paul
Revere did not merge into any of the other corporate entities,
Plaintiffs have presented correspondence demonstrating the
involvement of Provident and UNUMProvident in the handling of Dr.
Locastro's claim.[7]  Plaintiffs have also produced corporate documents
reflecting the merger and integration of these companies.
Plaintiffs' evidence raises sufficient question as to the
relationship between the corporate entities to allow Plaintiffs to

---

[7] The Court notes that Defendants' own exhibits reflect that
inquiries sent to Paul Revere concerning Dr. Locastro's claim were
consistently referred by Paul Revere to UNUMProvident.  See, Defs.'
Exhs. 4, 6.

conduct discovery on that issue.

The Court reaches a different result as to the individual defendants.  According to the allegations in the Amended Complaint, all four of the individual defendants are residents of the state of Massachusetts.  The Amended Complaint also states that all four individuals were acting within the scope of their employment with the defendant corporate entities at all times relevant to this action.

As this Court recently observed, "Maryland recognizes the fiduciary shield doctrine which 'serves as a limitation on the reach of a long-arm statute with respect to obtaining jurisdiction over an individual who acted solely as a representative of a corporation, rather than on his or her own behalf.'"  U.S. v. Undetermined Quantities of Articles of Drug 145 F.Supp.2d 692, 706 (D. Md. 2001) (quoting Christian Book Distributors, Inc. v. Great Christian Books, Inc., 137 Md.App. 367, 378-79 (2001)).  "'The fiduciary shield doctrine protects an individual, who acts in the forum state solely as the representative of the corporation, from suit in that state because he does not personally avail himself of the laws and protection of the forum state in any meaningful way.'"  U.S. v. Undetermined Quantities, 145 F.Supp.2d at 706 (quoting Zeman v. Lotus Heart, Inc., 717 F.Supp. 373, 375 (D. Md. 1989)).[8]

Plaintiffs seek to avoid the application of this doctrine by

---

[8] There are two recognized exceptions to the doctrine: "'(1) when the individual is the alter ego of the corporation or (2) when the individual has a substantial interest in the corporation.'"  Id. (quoting Christian Book Distributors, Inc., 137 Md. App. at 378).  There are no allegations in the Amended Complaint that would support the application of either exception.

hypothesizing that "[e]ach of the torts [under which the individual defendants are sued] is an intentional wrongdoing that typically takes an employee outside the scope of employment and into an area of ultra vires acts." Opp. at 2. There is nothing in the Amended Complaint, however, to support the conclusion that these individuals were acting "ultra vires" and, in fact, this contention is directly at odds with the allegations in the Amended Complaint that they were acting within the scope of their employment at all times. More significantly, the very gravamen of the complaint is that these actions were not ultra vires but were an integral part of the business practices of the corporate defendants. The clear conclusion of the Court is that the fiduciary shield doctrine prevents this Court from exercising jurisdiction over the individual defendants.

Related to the issue of the identity of the proper defendants is the issue of whether any of Plaintiffs' conspiracy claims can stand. A civil conspiracy requires an agreement or understanding between two or more persons or entities. Green v. Washington Suburban Sanitary Comm'n, 259 Md. 206, 221 (1970). It is also well settled under Maryland law that a corporation cannot conspire with its own employees or agents. Marmott v. Maryland Lumber Co., 807 F.2d 1180, 1184 (4th Cir. 1986). As Plaintiffs allege that each of the individual defendants were employees or agents of Paul Revere, they cannot have conspired with their employer or principal. Similarly, if Plaintiffs are correct that all of the corporate defendants merged into a single entity, there could be no conspiracy, as that single entity could not conspire with itself.

12

Nevertheless, Defendants adamantly assert that the corporate entities are not a single entity, and even in Plaintiffs' view, they were separate entities for at least a part of the relevant time period.  While the results of discovery may dictate a different result, at this juncture, the Court will not dismiss the conspiracy claims.

### C. Breach of Covenant of Good Faith and Fair Dealing

Maryland law recognizes an implied covenant of good faith and fair dealing in all negotiated contracts.  Eastern Shore Markets, Inc. v. J.D. Associates Ltd. Partnership, 213 F.3d 175, 182 (4th Cir. 2000).  The scope of this covenant, however, as Plaintiffs acknowledge, is rather limited.  The duty "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract."  Id.

In support of this particular claim, Plaintiffs detail the efforts that Dr. Locastro undertook to schedule and obtain an IME.  In February 2002, such an examination was scheduled, but it did not go forward after the examining doctor refused Dr. Locastro's conditions, first, that he be allowed to have the examination videotaped by two nurses, and second, when that request was refused, that the nurses be allowed to observe the exam and take notes.  Plaintiffs argue that by imposing these restrictions on the manner in which an IME would be performed, the insurance company defendants "inserted extra-contractual provisions into Dr. Locastro's policy that have prevented him from

13

performing an obligation of his thereunder." Opp. at 4.[9]

The obvious defect in this argument is that the contract did not require

Dr. Locastro to submit to an IME in order to comply with his obligations under

the contract.  The policy gave Paul Revere the option of requesting an IME,

see Policy at ¶ 9.5, but did not give Dr. Locastro the right to demand that

one be performed.  Furthermore, the contract did not give Dr. Locastro the

right to dictate the conditions under which an IME, if requested by Paul

Revere, was to be performed.  Accordingly, the Court will grant judgment as to

Counts Three and Four.

### D. Fraud

To sustain an action for fraudulent misrepresentation, the plaintiff

must prove:

> (1) that the representation made is false; (2) that
> its falsity was either known to the speaker, or the
> misrepresentation was made with such a reckless
> indifference to truth as to be equivalent to actual
> knowledge; (3) that it was made for the purpose of
> defrauding the person claiming to be injured thereby;
> (4) that such person not only relied upon the
> misrepresentation, but had a right to rely upon it in
> the full belief of its truth, and that he would not
> have done the thing from which the injury resulted had
> not such misrepresentation been made; and (5) that he
> actually suffered damage directly resulting from such
> fraudulent misrepresentation.

Martens Chevrolet, Inc. v. Seney, 292 Md. 328, 333 (1982)(citing Gittings v.

Von Dorn, 136 Md. 10, 15-16 (1920)).  Maryland law recognizes a cause of

---

[9] Plaintiffs also argue that Defendants' failure to pay Dr.
Locastro disability benefits made it difficult for him to pay his
premiums, although he has been able to do so.  Opp. at 4.  The Court
finds this connection too tenuous to support this very limited tort.

14

action for fraud predicated upon a promise made with a present intention not to perform it.  <u>Gross v. Sussex Inc.</u>, 332 Md. 247, 258 (1993) (holding that "making a promise as to a matter material to the bargain with no intention to fulfill it is an actionable fraud"); <u>Finch v. Hughes Aircraft Co.</u>, 57 Md. App 190, 233 (1984).  Furthermore, under both federal and Maryland law, the circumstances constituting fraud must be alleged with particularity.  <u>See</u> Fed R. Civ. P. 9(b); <u>Brack v. Evans</u>, 230 Md. 548, 553 (1963).  That particularity must include the "time, place, and nature" of the alleged misrepresentation.  <u>Lasercomb America, Inc. v. Reynolds</u>, 911 F.2d 970, 980 (4th Cir. 1990).

While the Court found the allegations in the original complaint insufficient to support a claim for fraudulent misrepresentation, the Court finds that the allegations in the Amended Complaint are adequate.  Plaintiffs have identified specific representations made to them in Paul Revere sales brochures that were provided to them by their insurance agents at a meeting that took place on or about August 4, 1994.  It was represented to Plaintiffs, <u>inter alia</u>, that if Dr. Locastro was found to be totally disabled from performing the specific activities of his medical specialty, under a "liberal definition" of total disability, he would be paid monthly disability benefits.  Plaintiffs assert that these representations were known to be false when made[10] and that Paul Revere never had any intention of honoring the

---

[10] The Court notes that Dr. Locastro purchased his policy in 1994 and, in another portion of the Amended Complaint, Plaintiffs allege that it was not until 1997 that Paul Revere "changed" its corporate policy to routinely deny disability claims.  <u>See</u> Amended Complaint at ¶ 42.  Defendants, however, made new statements after

policy and paying benefits.  Plaintiffs further allege that, in reliance on these misrepresentations, Dr. Locastro purchased the Paul Revere disability policy and continued to pay premiums.  Dr. Locastro also refrained from purchasing a disability policy from a different insurer.

Relying on the Maryland Court of Special Appeals decision in <u>Twelve Knots Ltd. Partnership v. Fireman's Fund Ins. Co.</u>, 87 Md. App. 88 (1991), Paul Revere argues that "an insured is not justified in relying on prior misrepresentations not contained in the written insurance contract where the language that is contained in the written contract bears on the same subject matter and contradicts the alleged misrepresentations." Mot. at 13.  While presenting an accurate statement of Maryland law, Paul Revere does not explain how any of the language in the policy contradicts any of the alleged fraudulent misrepresentations.  In the absence of such a contradiction, the holding in <u>Twelve Knots</u> would not appear to bar Plaintiffs' fraud claim.

Just recently, in <u>Cooper v. Berkshire Life Insurance Co.</u>, 148 Md. App. 41 (2002), the Maryland Court of Special Appeals held that the plaintiffs could bring a fraud claim against the company that issued them two life insurance policies based upon misrepresentations presented to them by the insurance agents in selling them those policies.  The life insurance policies at issue were "disappearing premium" policies, and the insurance agents, using company supplied sales materials and information, represented that the plaintiffs would only need to pay premiums for ten years, after which time

---

1997 in the course of collecting premiums and soliciting increased coverage that would be fraudulent if Paul Revere had indeed changed its corporate policy.

dividends on overpayments of premiums in the first ten years would cover all
future premiums.  In a portion of that opinion relied upon by Paul Revere, the
Court of Special Appeals held that <u>Twelve Knots</u> did bar the plaintiffs' fraud
claim based upon an oral representation allegedly made to the plaintiffs in
selling them the policies that the ten year premium schedule that was shown to
them was "guaranteed."  <u>Id.</u> at 61.  The court found the fraud claim barred
because there was a provision in the policies that clearly stated that the
dividends were not guaranteed.

    Nevertheless, the Court of Special Appeals in <u>Cooper</u> allowed a
fraudulent inducement claim based upon factual inaccuracies contained in the
illustration used to sell the policies.  The plaintiffs alleged that the
illustration used to demonstrate how the premiums would disappear in ten years
was inconsistent with the insurance company's own internal forecasts,
estimates, analyses and projections, despite the company's claim that the
illustration reflected the "current company experience."  <u>Id.</u> at 64.  The
court concluded that because, "a reasonable juror could find, based on the
expert opinion proffered by the Coopers, that at the time they used the ten
year premium illustration to make the sale to the Coopers, [the insurance
company] knew that, given the company's 'current . . . experience,' it was
highly unlikely that the Coopers would have to make premium payments for only
ten years," the plaintiffs should have been allowed to proceed on a fraud
claim based on the "inaccurate illustration."  Unlike the "guaranteed
illustration" claim, this claim would not be barred under <u>Twelve Knots</u>.  <u>Id.</u>
at 64.

    In addition to its reliance on <u>Twelve Knots</u>, Paul Revere also attempts

in its reply brief to challenge Plaintiffs' ability to prove that the

representation that Paul Revere would pay monthly benefits to Dr. Locastro if

he should become disabled was "false when made."  Reply at 4.  In a somewhat

cyclical (if not cynical) argument, Paul Revere reasons,

> the mere fact that Dr. Locastro did not receive
> disability benefits does not mean any such statement
> by Paul Revere was "false when made."  Indeed, Dr.
> Locastro's contract clearly does provide him with
> monthly disability benefits if he qualifies for those
> benefits.  Paul Revere, however, determined Dr.
> Locastro was not entitled to benefits because he
> failed to establish that he was "disabled" under the
> contract's terms.

Id.  It is, however, the gravamen of Plaintiffs' fraud claim that Paul

Revere's determination was not a legitimate "determination" at all but was, in

fact, a "pre-determination," i.e., whatever evidence he provided, he would

have been found not to be disabled.

Paul Revere is correct that the fact that the claim was denied is not

proof that the claim was false when made.  At this preliminary stage in the

litigation, however, Plaintiffs do not have the burden of coming forward with

definitive evidence of the falsity of the representation; they must merely

give the factual basis for their claim.  This Plaintiffs have done, supporting

their claim with, inter alia, the summary of deposition testimony given by Dr.

Patrick McSharry, one of UNUMProvident's former in-house medical advisors, in

a civil action filed by Dr. McSharry against UNUMProvident.  Dr. McSharry

describes the Defendants' procedures for handling claims and testified that

"it was Defendant's primary purpose and policy to deny disability claims.  The

medical advisors were only to be used to provide language and conclusions

supporting denial of claims."  Amended Comp. at ¶ 78.  This and similar

testimony set forth in the Amended Complaint is sufficient to support Plaintiffs' representation of Paul Revere's present intent, at the time Dr. Locastro purchased his policy, not to pay benefits for legitimate disability claims.[11]

Paul Revere next argues that Plaintiffs' fraud claims are barred by the statute of limitations. There is no dispute that Maryland's three year statute of limitations applies to these claims. Md. Code Ann., Cts. & Jud. P. § 5-101. Under the discovery rule, however, the cause of action does not accrue until the claimant knew or reasonably should have known of the wrong. Poffenberger v. Risser, 290 Md. 631, 636 (1981). Under the facts alleged in the Amended Complaint, the earliest that Plaintiffs could have known of Paul Revere's intentions as to the payment of claims is when Dr. Locastro's claim was denied in December of 1999. Thus, the suit was timely filed. See Cooper 148 Md. App. 89 (holding that statute of limitations on "inaccurate illustration" claims against insurer did not begin to run until the plaintiffs were put on notice of their claim).

Paul Revere's final challenge to Plaintiffs' fraud claim is that the claim is barred by the parol evidence rule. There is, however, a well established fraud exception to the parol evidence rule. "[T]he law in Maryland . . . is that a plaintiff can successfully bring a tort action for fraud that is based on false pre-contract promises by the defendant even if 1

---

[11] Defendants have moved to have many of these allegations related to the pattern and practice of claims handling stricken from the Amended Complaint as immaterial. The Court will deny that motion at this time, finding that most of these challenged allegations are material to Plaintiffs' fraud claim.

the written contract contains an integration clause and even if 2) the pre-
contractual promises that constitute the fraud are not mentioned in the
written contract." <u>Greenfield v. Heckenbach</u>, 144 Md. App. 108, 130 (2002).

### E. Intentional Infliction of Emotional Distress

The elements that must be present to impose liability for intentional
infliction of emotional distress are well established.  The plaintiff must
prove: (1) defendant's conduct was reckless or intentional; (2) that conduct
was extreme and outrageous; (3) there was a causal connection between the
wrongful conduct and the emotional distress; and (4) the emotional distress
must be severe.  <u>Batson v. Shiflett</u>, 325 Md. 684, 734 (1992) (citing <u>Harris v
Jones</u>, 281 Md. 560, 566 (1977)).  Maryland courts have made it abundantly
clear, however, that only the most compelling facts will satisfy these
elements.

For conduct to be considered "extreme and outrageous" under the "high
standard of culpability" established by Maryland courts, the conduct must be
"so outrageous in character, and so extreme in degree, as to go beyond all
possible bounds of decency, and to be regarded as atrocious, and utterly
intolerable in a civilized community." <u>Harris</u>, 281 Md. at 567 (quoting
Restatement (Second) of Torts § 46, comment d).  To be actionable, the conduct
relied upon "must strike to the very core of one's being, threatening to
shatter the frame upon which one's emotional fabric is hung." <u>Hamilton v.
Ford Motor Credit Co.</u>, 66 Md. App. 46, 59-60, <u>cert. denied</u>, 306 Md. 118
(1986).  A plaintiff must allege "'a severely disabling emotional response',
so acute that 'no reasonable man could be expected to endure it.'" <u>Leese v.
Baltimore County</u>, 64 Md. App. 442, 471, <u>cert. denied</u>, 305 Md. 106 (1985)

(quoting Harris, 281 Md. at 571).

The Maryland Court of Appeals has specifically held that the intentional refusal to pay medical and disability benefits to which the plaintiff claimed entitlement under an insurance plan was not sufficiently "outrageous" to give rise to a claim for intentional infliction of emotional distress. Gallagher v. Bituminous Fire & Marine Ins. Co., 303 Md. 201, 211-12 (1985); see also, Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1481 (4th Cir. 1996). While a scheme whereby an insurer determines at the time that a policy is sold that benefits will never be paid is arguably more outrageous, it still falls short of the extreme conduct that courts have recognized as being actionable under this tort.

The Court will grant Paul Revere's motion as to Counts Eight and Nine.

**F. RICO Violation**

The Fourth Circuit recently set out the framework in which to evaluate a civil RICO claim:

> In order to prevail on its RICO claim, [a plaintiff is] required to prove that [the defendant] had engaged in a "pattern of racketeering activity." 18 U.S.C. §§ 1962; H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 232-33 (1989). Under RICO, "racketeering activity" is defined as "any act or threat" involving specified state law crimes, such as murder or bribery, or an "act" indictable under various federal statutes, such as mail and wire fraud. 18 U.S.C. §§ 1961(1). To have a "pattern" of such activity, two or more predicate acts of racketeering must have been committed within a ten year period. Id. §§ 1961(5). These requirements are designed to prevent RICO's harsh sanctions, such as treble damages, from being applied to garden-variety fraud schemes. See H.J. Inc., 492 U.S. at 233; see also Menasco, Inc. v. Wasserman, 886 F.2d 681, 683 (4th Cir. 1989) ("The pattern requirement in §§ 1961(5) thus acts to ensure that RICO's extraordinary remedy does not threaten the

ordinary run of commercial transactions.").

ePlus Technology, Inc. v. Aboud, 313 F.3d 166, 181 (4th Cir. 2002).

Accepting as true the allegations in the Amended Complaint, the Court finds that Plaintiff has stated a cause of action under RICO under this framework.  Plaintiffs point to wire and mail fraud as the predicate acts.  To establish mail or wire fraud, a plaintiff must establish (1) a scheme to defraud and (2) use of a mail or wire communication in furtherance of that scheme.  ePlus Technology, 313 F.3d at 181.  As the Court has stated above, Plaintiffs have adequately alleged a scheme to defraud Dr. Locastro and other insureds.  Plaintiffs also allege that Defendants used the mails and telephone to market their disability policies, solicit increases in coverage, and to collect premiums, all with the intent of denying claims for disability benefits, regardless of the merits of those claims.  This use of the mails and wires was in furtherance of the alleged scheme.

To establish a pattern under RICO,

> a plaintiff . . . must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc., 492 U.S. at 239 (first and third emphasis added).  In essence, the pattern requirement has been reduced to a "continuity plus relationship" test.  Id. As we have observed, there is no mechanical formula to assess whether the pattern requirement has been satisfied; it is a commonsensical, fact-specific inquiry. . . .  For the predicate acts to be related, they must have "'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and [not be] isolated events.'" H.J. Inc., 492 U.S. at 240 (quoting 18 U.S.C. §§ 3575(e)). The continuity aspect, in turn, refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. at 241.

> Significantly, "[p]redicate acts extending over a few
> weeks or months and threatening no future criminal
> conduct do not satisfy this requirement: Congress was
> concerned in RICO with long-term criminal conduct."
> Id. at 242.  Thus, it is clear that predicate acts of
> racketeering activity must be part of a prolonged
> criminal endeavor.

ePlus Technology, 313 F.3d at 181-182.

Here, Plaintiffs allege a scheme that extended from 1994 to present, involving scores of insureds being victimized by the same pattern of conduct. This Court recognizes that the Fourth Circuit has cautioned against imposing civil RICO liability for garden-variety violations of the mail and wire fraud statutes "because it will be the unusual fraud that does not enlist the mails and wires in its services at least twice."  Al-Abood v. El-Shamari, 217 F.3d 225, 238 (4th Cir. 2000).  Nonetheless, if Plaintiff can establish at trial all that they allege in the Amended Complaint, they will have established far more than a run-of-the-mill fraud claim.

### G.  Punitive Damage Claims and Attorney's Fees

Finally, Defendants challenge Plaintiffs' inclusion of a prayer for punitive damages in Counts I and II, and the recovery of attorney's fees.  As for the punitive damages claims, the Court agrees that they are not recoverable under a contract claim.  See Munday v. Waste Management of North America, Inc., 997 F. Supp. 681, 685 (D. Md. 1998).  Therefore, the prayer for punitive damages will be struck from Counts I and II.

As for the request for attorney's fees, the Court finds the resolution of that issue premature.

### IV. CONCLUSION

For the reasons stated, the Court will: dismiss all claims against

Defendants Bianchi, O'Hara, McKiernan, and LaRochelle; dismiss Counts Three, Four, Eight, Nine and Ten in their entirety; and, strike the prayer for punitive damages from Counts


I and II.  A separate order consistent with this memorandum will issue.


                                    /s/
                          _____
                          William M. Nickerson
                          Senior United States District Judge


Dated: March 17, 2003