## DECLARATION OF EXPERT TESTIMONY

I am an expert in disability insurance coverage based upon my education, training and twenty-three years experience in the insurance industry that is stated in my curriculum vitae which is attached to this report. I have seventeen years experience as an insurance expert witness and have testified in both state and federal court. I have been retained and or deposed in insurance cases in California, Nevada, Arizona, Washington, Hawaii, New Mexico, Kentucky, North Carolina, Colorado, Oklahoma, Idaho and Pennsylvania.

I have a Master Degree in Business Administration (MBA) with an emphasis on insurance from the Wharton School at the University of Pennsylvania. I was a licensed agent with Paul Revere, Provident Life and Accident and UNUM, (all of which are wholly owned and operated subsidiaries of the parent company, UnumProvident Corporation) and am familiar with the marketing and types of disability products sold to Dr. Robert Locastro

I qualified and testified as an expert in  Hangarter v. Paul Revere Life, UnumProvident.

## OPINIONS AND BASIS AND REASONS THEREFOR

Dr. Robert A. Locastro purchased a non-cancelable guaranteed renewable "own occupation" disability policy from Paul Revere Policy #0102685178 effective August 24,

1

1994. The original policy paid benefits after a 91-day elimination period and paid monthly disability benefits of $5,000 to age 65. Dr. Locastro paid an additional premium of $219.00 for an "Own Occupation" rider. The policy provided for a residual benefit. The policy also provided future automatic monthly benefit increases in the amount of $250.00 during the first five policy years, which increased the monthly benefit to $6,250.00 in 1994. In addition, the policy had a Future Insurance Option of six units of $500.00, which were exercisable until August 24, 2004.

The policy stated "Total Disability" means that due to Injuries or Sickness:

1. You are unable to perform each and every of the important duties of Your Occupation; and

2. You are receiving Physician's Care.

This "total disability" contract language was "clarified" in a specialty letter written to Dr. Locastro by Paul Revere Vice President Michael Marr on September 14, 1994. This letter stated:

"Your policy, which includes coverage for "Total Disability In Your Occupation" provides that you would be considered Totally Disabled if, because of injury or sickness, you were unable to perform the important duties of Your Occupation and were receiving appropriate physician's care.

By "Your Occupation," we mean the occupation or occupations in which you are regularly engaged at the time disability begins. We understand your current occupation to be that of a specialist in the field of anesthesiology."

Important historical background is necessary to understand the disability insurance product, marketing, and claim practices established and approved by senior management of Provident, and parent company UnumProvident Corporation and it's fully owned subsidiary Paul Revere Life.

Agents marketed these "own occupation" policies to medical doctors, dentists and attorneys stating that if the professional could not perform the substantial and materials duties of his specific professional specialty and either retrained in another specialty, taught or went into another profession, they would still be entitled to "total disability" benefits under the policy.

As previously mentioned Dr. Locastro paid The Paul Revere an additional premium of $219.00 for this "own occupation" rider.

Dr. Locastro's own occupation at the time of claim was an "anesthesiologist".

The medical, dental and legal professional market was viewed as a very lucrative market, because social security disability benefits were minimal.

These "own occupation" policies were only available to certain professionals. The definition of disability became closely scrutinized in the marketplace and insurance companies leap-frogged each other in attempts to enhance "own occupation" policy benefits.

This Paul Revere clarification letter of September 14, 1994 went on to explain:

> "If immediately prior to the time disability begins, you were performing the important duties of that specialty and then, were unable to perform those duties, you would be considered unable to perform the important duties of Your Occupation. The fact that you could be working in some other occupation or specialty would not preclude the payment of Total Disability benefits."

In approximately 1983, Provident Life & Accident, Paul Revere and UNUM, were independently owned corporations. They and a handful of other insurance carriers were in a heated competition to sell non-cancelable guaranteed renewable disability policies.

These non-cancelable guaranteed renewable policies did not allow the insurance company the right to raise premiums in the future nor allow the company to cancel the coverage.

Tom Heys, Senior Vice President of Provident, acknowledged in a memo in 1994 that, "The early and mid-1980's were characterized by a highly competitive, growth oriented market environment. Product provisions and underwriting were liberalized and

commissions increased as the primary competitors in the market attempted to grow share. The product sold is non-cancelable which means it can neither be canceled nor its price raised, covering the own occupation of the individual and typically with an option to choose at time of issue lifetime benefits or some shorter period."

Mr. Heys further conceded: "In hindsight, it is generally viewed that the policies sold during this period were poorly underwritten and under priced. This was common among competitors, but Provident seems to have taken it a few steps further. Provident, in many cases, won the market share battle and, in fact, was very successful in certain high population growth states such as California and Florida. As a result, it is felt that, as other companies were tightening their offerings, many of the poor risks went to Provident."[1]

"In the early to mid 1980's, Provident liberalized its IDI (Individual Disability Income) coverage benefits in reaction to market conditions and to garner increased market share. Driven by marketing interests, the liberalization of benefits resulted in overly generous coverage terms and benefits. When combined with minimal defenses and exclusions, changing societal norms and inadequate pricing, overly generous terms resulted in the diminished profitability of Provident's IDI book of business."[2]

In 1993 Conning & Company reported, "Individual non cancelable disability income has been one of the most consistently unprofitable segment of the life and health insurance

---

[1] Situation Analysis: Provident's Disability Operations  T.B. Heys  9/29/94  (PROV 02089)
[2] Individual Disability Line of Business Reengineering Project by LeBoeuf, Lamb, Greene & MacRae.

industry in recent years. Statutory results have been in an extended down cycle since 1986. In 1992, 31 of 32 companies studied suffered statutory underwriting losses...We project that the industry as a whole will not reach break even on a statutory pre- tax operating gain basis until 1996."[3]

In 1993, Provident Life's president resigned and Provident Life took a special charge of $423 Million dollars due to its block of individual disability income business. This meant they had to increase the reserves on this block of business. Which meant the asset side of the company's balance sheet remained the same, however the liabilities increased and thus the company had a smaller net worth. This special charge was required after the Company completed a loss recognition study as of September 30, 1993.[4]

At the end of 1993, J. Harold Chandler was hired as President and CEO of Provident Life. Mr. Chandler's previous experience was as President of Nation's Bank Mid Atlantic Banking Group.[5] As part of his compensation he earned $813,924 and was given 110,000 stock options for the two months of 1993; and in 1994 $1,083,362 and an additional 190,000 stock options for the next year.[6]

Senior Vice President T.B. Heys description of the year 1994 is "somewhat of a crisis atmosphere has existed with the continuing high level of new claims."[7]

---

[3] Non Cancellable Disability Insurance Decision Time Conning & Co. 1993  (GSCONF 27.1077)
[4] Provident Inc. 1994 Annual Report
[5] Deposition of J. Harold Chandler  Walker v. Provident  pg. 6.
[6] Provident Inc. 1994 Annual Report
[7] Situation Analysis: Provident Disability Operations T.B. Heys  9/29/94  (PROV 02088)

In late 1993 or early 1994, "in connection with the company's reengineering of its individual disability insurance business," Provident retained the actuarial firm Tillinghast and the law firm LeBoeuf, Lamb, Green & Mc Rae. LeBeouf and Tillinghast worked jointly and "relied on each other" to create separate reports [8]

One of Le Boeuf's recommendations to Provident Life was "to vigorously change the 'corporate culture'. Make the adjustor- not the attending physician – the expert on claimant's condition, the proper treatment and how those aspects of a claim are connected to the insurance policy at issue. Build upon these changes to use the 'subjective nature of mental and nervous claims to the Company's advantage.'"[9]

In September of 1994, Ralph Mohney was transferred from the group medical department to Vice President of Claims overseeing the disability business even though he had no disability insurance claims experience.

In December 1994, Provident discontinued selling all non-cancelable, own occupation individual disability policies. However, this had no impact on all of the existing disability policies from the last 11 years that were still in effect and experiencing higher than anticipated claim losses and low fixed premiums.

---

[8]  Individual Disability Line of Business Reengineering Project LeBoeuf, Lamb, Greene & MacRae
     Page 1  (GSCONF 27.1146)
[9]  Ibid   page 73

Even though this block of disability business was under priced and experiencing poor morbidity, Provident was unable to raise prices nor cancel coverage because these policies were issued as "noncancellable and guaranteed renewable".

On April 24, 1995, Ralph Mohney sent a memo to 16 Provident Life claims and legal personnel. This memo outlined the beginning of what was then to be known as the "roundtable" process. The "roundtable" meeting would take place every Tuesday and Thursday beginning at 4:00 p.m. and was expected to last three to four hours.[10] These roundtable meetings consisted of Provident Life claims adjustors, company doctors and company lawyers were to review "high impact problematic claims" Each of the six claim units were to present two claims per week.

Later the roundtable reviews were expanded to daily.[11] Provident Senior Vice President Heys commented, "Large new claims, denials and problem situations are discussed in a cross functional format…This new approach is consistent with the institutionalization of the claim management approach and one which I think will continue to give us a good pay back."

Mr. Mohney sent an internal memo to President Chandler on May 22, 1995. In this memorandum he discussed moving Provident Life's disability claims management handling "from a claims payment to a claim management approach." The memo quantified the financial return associated by initiating the new approach to claims

---

[10] Provident Internal Memorandum April 24, 1995
[11] Tom Heys Monthly Management Report September 17, 1996

handling. Mr. Mohney articulated that a one percent decrease in benefit costs would translate into $6 million in savings and that he believed the amount of decrease in benefit cost would be in the 5% to 10% range equating to a $30 million to $60 million savings to Provident Life. [12] The memo's financial savings was corroborated by the Tillinghast actuarial study.

This memorandum specifically requested Mr. Chandler's approval to implement certain new disability insurance claims initiatives. Senior Vice President Tom Heys wrote on this memo "Move w/ sense of urgency"[13] in implementing these initiatives after discussing this with Mr. Chandler.

In order for Provident Life to obtain this $30-$60 million savings, it outlined a performance objective. A new goal was established in the form of a ratio to compare the net terminations of existing disability claims to reserves for new disability claims. The new ratio was called the "net termination ratio" and the net termination ratio goal was set at 84%. The "net termination ratio" meant that for each $1.00 of new claims that came in, $0.84 of existing claims had to be terminated. This goal became a monthly tracking device and it was the benchmark to see how well the new claim management initiatives were working. More specifically, it was the underlying monthly goal for termination of existing claims. [14]

---

[12] Provident Internal Memorandum May 22, 1995 (PROV 02101)
[13] Ibid
[14] Individual Disability Claims Performance Objectives (PROV 02111)

On June 9, 1995 Mr. Heys wrote a report entitled Monthly Risk Management Review to Mr. Chandler. It proclaimed in the month of May, the new initiatives had resulted in $41 million in claim terminations; reserves on new claims in May, however, were the highest of any month that year. He also boasted that the roundtable meetings had become "quite worthwhile."[15]

The impact of implementing the claims initiatives was again addressed in the December 1996 Monthly Risk Management report from Tom Heys to Harold Chandler. Mr. Heys stated, " Our net resolution ratio year to date is 98%. This compares to 74% for the full year 1995 and 84% if the first quarter of 1995 is excluded. [16]

A July 14, 1995, internal memo directed to Mr. Mohney set forth the new procedures to be implemented in the claims department.  A "Top 10 List" was started for each claim adjustor. "Each adjustor will maintain a list of ten claimants where intensive effort will lead to successful resolution of the claim. As one name drops off, another name will be added."  In addition a minimum of 10 files were to be referred to the field per month. Also "each adjustor was required to do an in-depth review of two files per week" of claims over two years old. "As issues surface, the adjuster will work with the consultant to find resolutions"[17]

Within several months of Mr. Chandler's arrival, a company trophy was given out to employees. This four inch statue had two birds on a limb with the wording "Patience, my

[15] Mohney Deposition  Schneider v. Provident  2/9/99  Exhibit 4
[16] Tom Heys Monthly Management Report December 17, 1996
[17] Internal Provident Memorandum  Steve Harmon  7/14/95  GSCONF 27.307

foot, I'm gonna kill something" was entitled the "Hungry Vulture Award". Mr. Chandler personally presented many of these trophies.[18]

In February 1996, fourteen-year Provident Life employee Dr. William E. Feist resigned as Medical Director and Vice President.[19] Dr. Feist believed that the Provident Life corporate culture had "changed dramatically after Chandler came in [.]" After participating in "round table" reviews for approximately ten months, it was his "impression [that Provident Life] was to find any way they could to terminate the claim."[20] Dr. Feist recognized that Mr. Mohney's "entire purpose" for the round table review was "to find cases that could be terminated and he encouraged and rewarded people that found such cases."[21]

In April 1996 Provident announced it would be acquiring Paul Revere for $1.2 Billion. Although the deal would not officially close until April 1997, Provident Life began a transition plan to implement its above referenced "claim management process" in Paul Revere in November 1996 [22].

In January 1997 Jeff McCall was relocated from Provident's office in Chattanooga, Tennessee to Paul Revere's office in Worchester, Massachusetts. According to Paul Revere claim director Sandra Fryc it was also around this time that the roundtable process

---

[18] J Harold Chandler Deposition 2/8/99 Walker V. Provident Page 258
[19] Deposition of William E. Feist Thompson v. Provident 1/25/99 page 13
[20] Ibid page 47
[21] Ibid page 58
[22] Provident/Paul Revere Transition Plan November 20, 1996 (PRB 004)

was "formalized" at Paul Revere.[23] Mr. McCall requested that written monthly reports were to be required of Paul Revere disability claims adjustors addressing claim resolutions (net terminations) and roundtable meeting reviews. Paul Revere disability claims staff performance was based on "key milestones" including "denials, termination, rescission, and settlement."[24] Jeff McCall reported directly to Ralph Mohney. Transition plan documents formally approved by senior management implemented Provident's claim handling practices, as mentioned above, at Paul Revere Life.

Disability claims are to be evaluated using a fair, thorough and objective evaluation. Each case must be looked at individually. The financial plans and projections created goals, quotas and targets for reaching financial milestones by terminating claims. Former UnumProvident Medical Director Dr. Patrick McSharry testified that employees were "under pressure" to meet targets and goals and that the "results meant the amount of resolutions or closures."

In addition to Unum Provident Medical Director, Patrick Fegal McSharry, former UnumProvident Vice President of Claims Mary Fuller has corroborated some of his testimony regarding UnumProvident's financial goals, Independent Medical Exams and the use of the roundtable process.

---

[23] Sandra Fryc Deposition   Weber v. Paul Revere  8/17/99  Page 68
[24] Provident/Paul Revere Transition Plan   November 20 November 1996  (PRB 065)

Mary Fuller has testified about the following:

<u>IME's (independent medical exam)</u>

"the IME was the biggest change."[25]  "So to move away from an IME was a change that occurred post merger."[26] UnumProvident's position on independent medical exams changed materially in 1999/2000.

"the company changed position relative to the criteria needed in order to order an independent medical exam. What was communicated was when there is a dispute between the attending physician and the in-house doctor, its appropriate if the in-house doctor can quote enough research and supporting documentation to contradict the attending physician opinion, then an IME would not be warranted."[27] "I was concerned that in the event of litigation having in-house - - only in-house documentation wouldn't be supported, that we wouldn't be able to defend our position adequately and that we weren't giving full consideration to all of the issues and that if we didn't do that, I didn't see how we were going to be able to defend ourselves."[28]

<u>Attending Physicians</u>

"How I interpreted it was that the strength of the attending physician's understanding and knowledge of the insured condition was not being given the same level of consideration that it had been previously... So it seemed like it was taking away a lot of authority from the attending and disregarding his perspective

---

[25] Mary Fuller Deposition Page 65
[26] Ibid  Page 79
[27] Ibid  Page 78
[28] Ibid Page 163

about treatment of the patient and putting more weight into a more generic view of a particular condition and particularly in an individual disability scenario that was a major shift, at least from my 17 years there it was a pretty major shift."[29]

Financial Goals

"Anytime there was a gap in what had been projected vs. where we were performing, the expectation was the activity level would heighten, late evenings, focus days, that sort of thing."[30] "If it appeared as though our liability acceptance rate (LAR) was slipping- - in other words, more claims were coming in, being paid - - then that would be considered a problem. If the termination rate dropped or resolution rate dropped, that would be considered a problem and then we would have to go in and understand what was causing those things to occur."[31] "The liability acceptance rate would impact reserves because if you increase the number of claims that you do not accept liability on, than you're not putting your reserves up for that claim. So as the liability acceptance rate drops fewer payments go into pay status there are fewer reserves put on the books. When there is an increase in resolution of claims, when a claim closes for any reason, there is a reserve attached to that claims that is taken down and the money applies to the bottom line."[32] "It is very hard when claims organizations are being asked to deliver on a number for people to look at a claim objectively and determine whether it's payable to begin with or time to terminate.

---

[29] Ibid  Page 78-79
[30] Ibid  Page 165
[31] Ibid  Page 94
[32] Ibid  Page 138

Dr. Locastro initially filed for claim with Paul Revere on April 5, 1999. His last day of work was February 11, 1999. He would be eligible for benefits on approximately May 12, 1999.

In a company presentation outlining Risk Profile Results "The profile clearly identifies a number of drivers of adverse financial results.

> Higher amounts of income of insured
>
> Existence of residual
>
> Longer benefit
>
> 1983-89 issues
>
> California and Florida " [33]

Robert Locastro's disability claim fell within some of the parameters of these benchmarks, including higher amounts of income, existence of residual and longer benefits.  As a result his claim became subject to the rigors of the Paul Revere claims departments.  The claim "adjustor not the attending physician" became the expert on claimant's condition.[34]

Dr. Henry Herbert certified Robert Locastro's attending physician statement and enclosed a Kaiser System Report which stated:

---

[33] Risk Profile Results   GSCONF 35.57
[34] LaBoeuf, Lamb Greene & MacRae Page 73

"This individual is precluded from his usual and customary work as an anesthesiologist because of his herniated nucleus pulpous L5-S1 with pain and radiculopathy. He is probably precluded from any type of gainful employment for at least the next 90 days until he has completed participation in facet blocks to his lubosacral spine and intensive physical therapy program. He will be reevaluated in two months."

In addition he stated that Dr. Spevak had treated Robert Locastro with epidural injections. Dr. Herbert's report included that Locastro was also evaluated at the Georgetown University Medical Center by William Lauerman M.D. on March 17, 1999.

Dr. Locastro's claim was rejected[35] in a letter written on Provident stationary by Shelly A. McKeirman Chief Claim Representative of the The Paul Revere Life Insurance Company on August 6, l999.

It is my opinion that Paul Revere and Provident fell below the standard of care in denying Dr. Locastro's disability benefits

1. Shelly McKeirman gave more weight to Provident's in house consultant, Dr. Bianchi, than to the treating attending physicians Dr. Herbert, Dr. Lauerman, Dr. Spevak and Dr. Sternberg.

---

[35] One of the performance measurement tools used by the Provident Companies is the Liability Acceptance Rate or LAR. This benchmark is used to measure claims which are rejected or liability not accepted..

2. Paul Revere's Shelly McKeirman and Dr. Bianchi failed to order an Independent Medical Exam.

3. Paul Revere's Shelly McKeirman and Dr. Bianchi failed to order a Functional Capacity Exam.

4. Paul Revere's in house consultant, Dr. Bianchi did not order the X-Rays or MRI or CRT films of Robert Locastro

5. Paul Revere's in house consultant, Dr. Bianchi did not rely on the actual x-ray or MRI or CRT films before determining that Robert Locastro was impaired.

6. Paul Revere made no attempt to contact any of the attending physicians regarding Dr. Locastro's condition in what is commonly known as a "doc to doc" call.

7. Shelly McKierman's denial letter contained material misrepresentation of the policy benefits regarding:

    a) Total Disability - that he was able to perform all the important duties of his occupation.

    b) Residual Disability- failing to mention that he had to be totally disabled before being eligible for residual disability benefits

    c) ERISA- that this policy was governed under ERISA.

    d) Other Benefits- She failed to appraise the insured of the rehabilitation benefit and recovery benefit.

8. Paul Revere failed to send a company representative out to interview Dr. Locastro.

The Office of the Insurance Commissioner of Georgia recently fined UnumProvident $1,000,000 based on a market conduct examination. This case is similar to the State of

Georgia findings in which the following recommendations made to Unum Provident (Respondent):

> "Respondents agree to be sensitive to claims in which a narrow interpretation of policy provisions or legal principles may lead to an unfair result. Respondents will consider and on a case by case basis, will make exceptions to such narrow interpretations, particularly in claims cases involving much more subjective determinations, in order to accomplish a fair result. Any such exception will be consistent with medical findings in the case, normal and customary application for the relevant policy provisions and applicable legal principles.

An independent medical exam is normally ordered when there is a difference in medical opinions between the treating physician and the in-house insurance company physician. IME's are valid when the examiner is truly independent. One of Provident claims initiatives was to create a network of physicians to perform independent medical exams. Company internal memo's regarding independent medical exams states the purpose of the IME is "to challenge the impairment findings".[36]  In addition, the IME arrangement letter should discuss "if a functional capacity evaluation is indicated, and should it be done before or after the IME."[37]  No Functional Capacity Exam was ever requested nor performed on Dr. Locastro. No IME was ordered prior to the initial denial of benefits.

---

[36] The IME  GSCONG 3450
[37] The IME Arrangement Letter  GSCONF  3451

Dr. Locastro was also insured under a group disability policy with Standard Insurance Company. Both claims were submitted at approximately the same time. Standard Insurance initially paid benefits under a reservation of rights and ordered an independent medical exam.

Dr. Loeffler performed the independent medical exam on Robert Locastro for Standard Insurance Company and wrote a report dated August 27, 1999. The independent medical exam found Dr. Locastro "unable of to return to his prior occupation of an anesthesiologist." Based on the IME Standard has paid Dr. Locastro his disability benefits.

Dr. Locastro filed a complaint with the Maryland Insurance Administration (MIA). In a letter to Paul Revere, MIA's Kay Hatchette dated September 29, 1999, she asked, "if you have ever offered an independent medical examination to the insured to confirm or disaffirm the findings?"

In another letter from the Chief of Investigations from the MIA Paul Revere was told of the Standard Insurance Company claim on Dr. Locastro and that they should either review the IME performed by Standard Insurance or perform a Functional Capacity Exam or an Independent Medical Exam.

Paul Revere obtained and reviewed the IME records from Standard Insurance. On December 2, 1999 Paul Revere's Tricia Berube responded to the MIA that "the IME

report dated August 27, 1999 and Dr. Loeffler's letter of September 22, 1999 offer no new objective evidence of a condition that would preclude Dr. Locastro from engaging in his occupation as an anesthesiologist."

On August 3, 2001 Dr Locastro wrote a letter to Margaret O'Hara requesting that she review and reconsider the denial of his February 11, 1999 claim. He attached Provident Monthly progress reports dated 12/20/00 and 1/17/01; Standard Insurance Company Attending Physician Statements dated 4/25/01; Follow up visit with Dr. Lauerman dated 4/4/01 and a Lumbar X-Rays by Dr. Gorlick dated 3/19/01.

On August 24, 2001 Paul Revere note indicated that Locatro's August 3rd letter was received on August 8, 2001, however the file could not be located and was not "in the closed" [section].

Dr. Locastro made subsequent calls and faxed additional information on September 21, 2001 and October 1, 2001 without any written response from the company.

A September 25, 2001 letter from his attending physician, Dr. Lauerman, at Georgetown University Hospital stated, "He is markedly impaired by his current situation." His letter continued "He has an antalgic gait on the right, walking with a cane."

Dr. Locastro had still not received a written response by October 28, 2001 from any of his numerous faxes and phone calls. On October 28, 2001 he again wrote Mr. Christopher

Ryan requesting a response to his August 3, 2001 letter. In addition he stated he had documented over 20 attempts to contact the company.

Paul Revere had an obligation to respond to Dr. Locastro in thirty days.

Finally, on November 5, 2001, nearly three months after his August 3rd letter, he received a letter from Michelle Magner of Paul Revere responding to his claim.

Michelle Magner referred the claim file to in house physician Dr. Howard Taylor. Dr. Taylor's December 12, 2001 response asked for copies of the "actual imaging films" and "it would also be helpful to have an independent medical evaluation".

These routine requests for an IME and the X-rays & MRI'S clearly demonstrate the inadequacy of the original claim investigation by Shelly McKierman and Dr. Bianchi in originally denying Robert Locastro's initial claim.

Dr. Locastro's independent medical exam was scheduled and not performed due to conflicts arising about a third party being allowed to record/monitor the exam.

Provident/Paul Revere owed Dr. Locastro a duty to perform a fair, thorough and objective investigation into his claim. Provident/Paul Revere did not perform a fair thorough and objective investigation.

Provident/Paul Revere owed Dr. Locastro a duty to perform a full, complete and timely investigation into his claim. Provident/Paul Revere did not perform a full, complete and timely investigation.

Provident/Paul Revere owed Dr. Locastro a duty to look for ways to pay the claim. Provident/Paul Revere did not look for a way to honor this claim.

Provident/Paul Revere owed Dr. Locastro a duty to interpret any ambiguity in the coverage in favor of the insured. Provident/Paul Revere did not interpret any ambiguity in the coverage in favor of Dr. Locastro.

Provident/Paul Revere owed Dr. Locastro a duty to not put their own financial interest ahead of that of the insured. Provident./Paul Revere put their own financial interest ahead of the insured.

It is my preliminary opinion that UnumProvident has breached the implied covenant of good faith and fair dealing by putting their own financial interests ahead of that of the insured in unreasonably and wrongfully denying disability benefits to Robert Locastro.

Dr. Locastro continues to receive monthly disability benefits from Standard Insurance Company. This group disability policy does not have an "own occupation provision" and to qualify for benefits is more restrictive in the contract language.

In addition, Dr. Locastro recently qualified for Social Security benefits. The definition of disability to qualify for social security disability is "unable to perform any gainful occupation". In contrast with the "own occupation" definition, it is much more difficult to be approved for Social Security disability than it is for an "own occupation" policy.

It is my opinion that UnumProvident has fallen below the standard of care in the handling of Dr. Robert Locastro's disability claim in the following ways:

1) Misrepresenting  to claimants pertinent facts of insurance policy provisions relating to any coverages at issue.

2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.

4) Failing to affirm or deny coverage of claims within a reasonable  time after proof of loss requirements have been completed and submitted by the insured.

5) Not attempting in good faith to effectuate prompt, fair  and equitable settlements of claims in which liability has become reasonably clear.

6) Compelling insureds to institute litigation.

Upon my preliminary review of these facts, it is my opinion that this case is similar to other Paul Revere Life cases[38] where the company has engaged in a pattern and practice of intentionally, willfully and maliciously denying bona fide disability claims based upon a "corporate culture" that was established to put the financial interests of the insurance company ahead of the rights of the insureds. Or as ex-Provident Medical Director, Dr. Feist testified, "becoming more concerned about the bottom line and, uh, profits than virtually anything else."[39]

This systematic effort to terminate disability claims was put into action by Provident Life's upper management beginning in 1994, to achieve financial goals associated with the "own occupation" non-cancelable guaranteed renewable disability policies like the one purchased by Robert Locastro M.D.

UnumProvident's recent 10K reaffirms that these management actions are still at work today. "In Provident's case, this strategy was the continuation of a new business focus initiated J. Harold Chandler after joining Provident in 1993. Provident undertook a number of major initiatives in pursing this strategy prior to the merger with Unum. Specifically.....(vii) strengthened its claims management procedures and return–to-work capabilities in the disability income insurance business..."

---

[38] Hangarter v. Paul Revere Life.
[39] Deposition of Dr. William E. Feist  1/25/99  Page 37

The 10K also acknowledge Dr. McSharry's financial goal comments in stating " The claim acceptance rate declined throughout 1999 and 2000 and the net claim resolution rate for 2000 increased from 1999."

Paul Revere, Provident, and Unum all subsidiaries of the parent UnumProvident Corporation, along with the assumption and reinsurance agreements in effect with, National Life of Vermont, Equitable, Provident Mutual and John Hancock control more than 50% of the entire individual disability industry. These combined entities have more than 1600 lawsuits pending in state and federal court. UnumProvident has attempted to "seek confidentiality orders at the beginning of litigation" and "when a case settles" in an attempt to keep "plaintiffs lawyers" from utilizing what could be perceived as damaging evidence.[40]

The evidence that has been produced in many of these cases, corroborated by the claims file and evidence produced thus far in this case, demonstrate that Paul Revere Life have engaged in  unreasonable, unfair, patterns and practices in the handling of disability insurance claims.

These acts of Paul Revere have been authorized, formalized and ratified by senior management of their parent corporation UnumProvident in the various internal documents and company memo's and continue to exist today as noted in the annual report.

---

[40] LeBoeuf, Lamb, Green & MacRae  Page 61-62.

25

At this time discovery is not complete and depositions still to be taken. Therefore I am not rendering a final opinion on Dr. Locastro's claim. It is my intention to supplement this Rule 26 report, prior to my deposition, after I have been provided with all the outstanding discovery and depositions.

## THE DATA OR OTHER INFORMATION CONSIDERED BY THE WITNESS IN FORMING THE OPINIONS

I have reviewed Dr. Locastro's Paul Revere Policy # 0102685178.

I have reviewed the original complaint and the claim file. I have also been provided with very correspondence related to the subject matter.

I have reviewed previous depositions and exhibits of J. Harold Chandler, Ralph Mohney, J. Christopher Collins, Dr.William E. Feist, Mary Fuller and Dr. McSherry and others in similar disability cases. I have reviewed the Laboeuf, Lamb, Greene and McRae report, the Tillinghast and Conning & Company studies and numerous Provident Internal Memo's footnoted above, including, but not limited to OMAR reports, Internal Memos on Legal cases, roundtables, independent medical exams, functional capacity evaluations, net termination ratio's, claim handling practices and management financial analysis.

26

I have reviewed Judge Larsen Findings of Fact and Conclusions of Law in <u>Hangarter v. Paul Revere.</u>

I have reviewed the Order by the Office of Commissioner of Insurance in the State of Georgia dated March 19, 2003.

I have reviewed Sections 27-219 – 27-304 and 15 1001-15 10C –01 of the Annotated Code of Maryland

I have reviewed the letter to Dr. Locastro from the Social Security Administration. I have reviewed the Final Order in Maryland Insurance Administration v. Paul Revere Life.

I intend to review the additional discovery as produced in this complaint including any additional depositions. I have relied on twenty-three years experience as an agent, and broker dealing with claims, insureds and insurance companies, as well as other Unum Provident disability cases in my seventeen years experience as a disability expert witness.

## EXHIBITS TO BE USED AS A SUMMARY OF
## OR SUPPORT FOR THE OPINION

At this time no exhibits have been prepared. A final determination has not been made to determine all the exhibits to summarize my opinion. However, it is anticipated that the policies, claim file including correspondence and documents, and exhibits may be used. In addition The IME, the Laboeuf Lamb Greene and Mc Rae report, Internal Provident

Memo's including Net Termination Ratios, Net Resolution Ratio's Liability Acceptance Rates, Claim Acceptance Rates and Financial Analysis, Presentations, the above referenced depositions and attached exhibits. As well as exhibits from Mary Fuller's deposition, State of Georgia Office of Insurance Commissioner, United Policyholders v. Provident, Hangarter v. Paul Revere, Chapman v. Paul Revere and other similar cases. Also Provident and UnumProvident financial statements may also be used.

At this time no exhibits have been prepared. A final determination has not been made to determine all the exhibits to summarize my opinion. In addition any exhibits attached to future depositions and any additional discovery produced.

## QUALIFICATIONS INCLUDING A LIST OF ALL
## PUBLICATIONS AUTHORED WITHIN THE LAST TEN YEARS

I have given my deposition over forty-five times in insurance related matters. I have testified at trial in over fifteen cases including Federal court in Los Angeles, California and Reno, Nevada and in state Court in Los Angeles, Santa Ana, San Diego, Van Nuys and Norwalk, San Francisco and Santa Cruz. Attached is my curriculum vitae, which outlines my education and experience. I have not published any documents in the last ten years.

## COMPENSATION TO BE PAID FOR THE STUDY AND TESTIMONY

Jul 02 03 09:17p          Frank Caliri, III          562 693 0160          p.1

I am paid three hundred twenty fifty dollars per hour to review and opine. My rate for

depositions and trial is three hundred fifty dollars per hour.

## A LISTING OF ANY OTHER CASIS IN WHICH TESTIMONY
## BY DEPOSITION OR TRIAL HAS BEEN PROVIDED

The attached curriculum vitae list the cases in which I testified in a deposition or in trial

in Federal or State Court of have performed significant related expert services.

Dated this ___3rd___ day of __July__ 2003 at ___Whittier___, California.

Frank Caliri III

FRANK CALIRI III

7658 GREENLEAF AVENUE
WHITTIER, CALIFORNIA  90602
(562) 693-1911 • FAX (562)  693-4130

## EDUCATION

University of Southern California
Bachelor of Science in Business Administration
Major:  Accounting          Minor:  Finance
June, 1977                   Cum Laude

University of Pennsylvania (Wharton School)
Masters in Business Administration
Major:  Insurance           Minor:  Finance
August, 1979

## EMPLOYMENT

Independent Insurance Consultant -
1973 to Present
Whittier, California
Insurance Sales - LIFE, HEALTH, GROUP, DISABILITY,
AND ESTATE PLANNING
Various General Agent and Brokerage Companies

## OTHER

C.L.U. - Chartered Life Underwriter
American College - October, 1979

Ch.F.C. - Chartered Financial Consultant
American College - October, 1984

Nine parts of 10 completed in F.L.M.I.
(Fellow Life Management Institute)

## EXPERT WITNESS CASES

| | | |
|---|---|---|
| Limb v. Mann | Reno, Nevada | Retained by Plaintiff |
| Andrews v. Schottke | Los Angeles | Retained by Defendant |
| Tillery v. Lincoln National | Los Angeles | Retained by Plaintiff |

| | | |
|---|---|---|
| American Home Life v. Turner | Orange County | Retained by Defendant |
| American Agency v. Friedman | Los Angeles | Retained by Defendant |
| Limb v. Mann (2nd Trial) | Reno, Nevada | Retained by Plaintiff |
| Roberson v. Equitable | Orange County | Retained by Plaintiff |
| Mack v. Cumberland Life | Orange County | Retained by Plaintiff |
| Arrelano v. Mutual of Omaha | Los Angeles | Retained by Plaintiff |
| Illulian v. Life of Virginia | Los Angeles | Retained by Defendant |
| Ferro v. Studley | San Diego | Retained by Defendant |
| Castro v. Equitable | Los Angeles | Retained by Defendant |
| Dismore v. Lincoln National | Orange County | Retained by Plaintiff |
| Wilson v. Noel | Los Angeles | Retained by Defendant |
| Berens v. Valley Forge | Los Angeles | Retained by Defendant |
| Stern v. Moe | Los Angeles | Retained by Defendant |
| Schwartz v. Singer | Los Angeles | Retained by Defendant |
| Marchant v. Provident | Los Angeles | Retained by Plaintiff |
| Tolley v. Northwestern | Los Angeles | Retained by Defendant |
| Raiders v. Crown Life | Los Angeles | Retained by Defendant |
| Deveraux v. Mass Mutual | San Diego | Retained by Defendant |
| Sovereign v. Fischbach | Los Angeles | Retained by Defendant |
| Lens v. Thieben v. John Hancock | Orange County | Retained by Plaintiff |
| Steinfeld v. Goldman | Van Nuys | Retained by Defendant |
| Benjamin v. Lee | Orange County | Retained by Plaintiff |
| Stovodynsky v. State Farm | Orange County | Retained by Plaintiff |
| Stonebreaker v. Royal Maccabees | Los Angeles | Retained by Plaintiff |
| Trainer v. Crown | Los Angeles | Retained by Defendant |

| | | |
|---|---|---|
| Kallenbach v. Golden Eagle | San Diego | Retained by Plaintiff |
| Perdue v. Rosen | Orange | Retained by Plaintiff |
| Promark v. Carr | Orange | Retained by Plaintiff |
| Reaves v. Equitable | Los Angeles | Retained by Defendant |
| Founders Mortgage v. General American | Los Angeles | Retained by Plaintiff |
| Wright v. Turtz | San Diego | Retained by Defendant |
| Constible, Nance, Simon v. Blue Shield | San Francisco | Retained by Defendant |
| Guardian v. Baum | Denver | Retained by Plaintiff |
| Daniel v. A.I.M., A. Bress | Los Angeles | Retained by Defendant |
| Rothfeld v. Equitable | Los Angeles | Retained by Defendant |
| Wood v. Paul Revere | Orange County | Retained by Defendant |
| Falcone v. Accelerated | San Diego | Retained by Defendant |
| Rodriguez v. Time Life | Riverside | Retained by Defendant |
| Davis v. Allie | Orange | Retained by Defendant |
| Ronnie v. Weissman | Los Angeles | Retained by Defendant |
| McKenna v. American Contracting | Torrance | Retained by Plaintiff |
| Maspero v. O'Tobo | Los Angeles | Retained by Plaintiff |
| Yoon v. Equitable/Whang | Los Angeles | Retained by Defendant |
| Dauer v. Amaradio | Los Angeles | Retained by Plaintiff |
| Clark v. Independent Order of Forresters | Ventura | Retained by Defendant |
| Commonwealth v. Gould | Los Angeles | Retained by Defendant |
| Wengart v. Travelers | Los Angeles | Retained by Plaintiff |
| Maccabees v. McCalla | Reno | Retained by Defendant |
| Wermut v. State Farm | Los Angeles | Retained by Plaintiff |

| | | |
|---|---|---|
| Eilerding v. Risler | Orange | Retained by Plaintiff |
| Dick v. Paul Revere | San Francisco | Retained by Plaintiff |
| Leibowitz v. Provident | Los Angeles | Retained by Plaintiff |
| Ruggieri v. Equitable | Fresno | Retained by Defendant |
| Sestero v. Pacific Guardian | Contra Costa | Retained by Defendant |
| Wenska v. General American | Los Angeles | Retained by Plaintiff |
| Kaye v. Mass Mutual | Los Angeles | Retained by Plaintiff |
| Clelland v. Blackman | San Diego | Retained by Defendant |
| Simpson v. Penn Treaty | Orange County | Retained by Plaintiff |
| Jackson v. CNA | Los Angeles | Retained by Plaintiff |
| Stay v. Clements/Guardian | Ventura | Retained by Defendant |
| Bowers v. Provident | Oklahoma City | Retained by Plaintiff |
| Mason v. Paul Revere | Las Vegas, Nevada | Retained by Plaintiff |
| Trietsch v. Ribart | Pomona | Retained by Defendant |
| Laird v. AMS | Reno, Nevada | Retained by Plaintiff |
| Boorman v. Adkins | Los Angeles | Retained by Plaintiff |
| Kramer v. Paul Revere | Los Angeles | Retained by Plaintiff |
| O'Brien v. Provident | Los Angeles | Retained by Plaintiff |
| Katona v. Gladstone | Los Angeles | Retained by Defendant |
| Gordon v. John Alden | Orange County | Retained by Plaintiff |
| United Policyholders v. Provident | Alameda County | Retained by Plaintiff |
| Goodwill Industries v. Metropolitan | Albuquerque, NM | Retained by Plaintiff |
| Smith v. Reassure America | Santa Cruz | Retained by Defendant |
| Judson v. Banner | San Diego | Retained by Plaintiff |
| Hangarter v. Paul Revere | San Francisco | Retained by Plaintiff |

| | | |
|---|---|---|
| Gularte v. Fremont | Los Angeles | Retained by Plaintiff |
| Bullock v. Phillip Morris | Los Angeles | Retained by Defendant |
| Smith v. Langton | San Francisco | Retained by Defendant |
| See v. Stewart | Orange County | Retained by Plaintiff |
| Phillips v. Blue Shield | San Francisco | Retained by Defendant |
| Gonzales v. Unum | San Francisco | Retained by Plaintiff |
| Goldberg v. Mass General | Los Angeles | Retained by Plaintiff |
| Patton v. Certified Life | Los Angeles | Retained by Plaintiff |
| Pachuta v. UnumProvident | Honolulu | Retained by Plaintiff |
| Cook v. Central Reserve Life | Phoenix | Retained by Plaintiff |
| Chapman v. Paul Revere | San Francisco | Retained by Plaintiff |
| Kirschner v. Blue Cross | Los Angeles | Retained by Plaintiff |
| Salman v. Celtic Life | Las Vegas | Retained by Plaintiff |
| Reassure America v. Rogers | Honolulu | Retained by Defendant |
| Allen v. National Life | Los Angeles | Retained by Plaintiff |
| Romero v. Associates | Los Angeles | Retained by Plaintiff |
| Brenner v. Provident | Orange County | Retained by Plaintiff |